## THE MODOC.

(District Court, W. D. Washington, N. D. July 31, 1914.)

### No. 2690.

COLLISION (§ 93*)—STEAM VESSELS CROSSING—VIOLATION OF RULES.

A collision in the evening in Elliott Bay, 400 feet off the Seattle piers, between the steamer Modoc, coming in from the north and proceeding parallel with the pier line, and the steamer Camano, which was heading for a slip, *held* due solely to the fault of the Modoc for failing to keep out of the way, as required by articles 19 and 22 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), and rule 8 of the Pilot Rules, having the Camano on her own starboard side, and also for moving at excessive speed in violation of Seattle Harbor Regulations, § 32, which limits the speed of vessels running parallel with the piers and within 2,000 feet to six miles an hour.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 194, 195; Dec. Dig. § 93.*]

In Admiralty. Suit for collision by the Island Transportation Company, owner of the steamer Camano, against the steamship Modoc, Sound Packet Lines, claimant, and cross-libel. Decree for libelant.

Libelant relies upon the following authorities: Marsden's Collision at Sea (6th Ed.) 473, 474; Spencer on Marine Collisions, § 172; The Marion (D. C.) 56 Fed. 271; The St. John v. Paine, 10 How. 557, 13 L. Ed. 537; The Coe F. Young, 49 Fed. 167, 1 C. C. A. 219; The New Orleans, 106 U. S. 13, 1 Sup. Ct. 90, 27 L. Ed. 96; Wilders S. S. Co. v. Low, 112 Fed. 161, at pages 172 and 173, 50 C. C. A. 473; The Geo. W. Roby, 111 Fed. 601, 49 C. C. A. 481; James D. Leary (D. C.) 110 Fed. 685; Chamberlain v. Ward, 21 How. 570, 16 L. Ed. 211; The Amboy (D. C.) 22 Fed. 555; The State of Alabama (D. C.) 17 Fed. 847; The Susquehanna (D. C.) 35 Fed. 325; The St. John (D. C.) 29 Fed. 221; The American Eagle (D. C.) 29 Fed. 302; The City of Paris, 9 Wall. 634, 19 L. Ed. 751; The Eider (D. C.) 37 Fed. 903; The Alaska (D. C.) 22 Fed. 548; The Panama (D. C.) 46 Fed. 496; The Nereus (D. C.) 23 Fed. 448; The Bristol (D. C.) 11 Fed. 156; The Jay Gould (D. C.) 19 Fed. 765; The Frostburg (D. C.) 25 Fed. 451; The America (C. C.) 37 Fed. 815; The Peshtigo, 25 Fed. 488; The Garden City (D. C.) 19 Fed. 529; The Hustler (D. C.) 100 Fed. 134; The City of New York, 147 U. S. 85, 13 Sup. Ct. 211, 37 L. Ed. 84; Spencer on Marine Collisions, 194, 195, and 226; The Active (D. C.) 22 Fed. 175; McFarland v. Selby Smelt. Co., 17 Fed. 253; The R. H. Williams (D. C.) 46 Fed. 414; The Columbia (D. C.) 8 Fed. 716; The Hattie M. Spracker (D. C.) 29 Fed. 457; Greenman v. Narragansett (D. C.) 4 Fed. 244; The Oregon, 158 U. S. 186, at page 197, 15 Sup. Ct. 804, 39 L. Ed. 943.

In addition to certain authorities cited by libelant, claimant relies on the following: The Ping-On v. Blethen (C. C.) 11 Fed. 607, at page

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

618; Spencer, Marine Collisions, §§ 26 and 27; The Louisiana, 21 How. 1, 16 L. Ed. 29; The Continental, 14 Wall. 358, 20 L. Ed. 801; The Pennsylvania, 19 Wall. 136, 22 L. Ed. 148; Desty's Ship. & Adm'r, 387; The Narragansett (C. C.) 11 Fed. 918; The Albert Mason (D. C.) 2 Fed. 821; The Oregon (D. C.) 27 Fed. 758; The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4,335; The Favorita, 18 Wall. 601, 21 L. Ed. 856; The Grace Girdler, 7 Wall. 201, 19 L. Ed. 113; Farr v. S. S. Farnley (D. C.) 1 Fed. 637; The City of Chester (D. C.) 27 Fed. 319; The Seacaucus (D. C.) 34 Fed. 68; City of Savannah (D. C.) 41 Fed. 891, at page 893; The Saratoga (D. C.) 37 Fed. 119, affirmed 40 Fed. 509; The Pavonia (C. C.) 26 Fed. 106; The State of Texas (D. C.) 20 Fed. 254; The Sam'l H. Crawford (D. C.) 6 Fed. 910; The Roman (D. C.) 12 Fed. 219; The Alabama (C. C.) 10 Fed. 394; Spencer on Marine Collisions, § 175.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for libelant.
Hastings & Stedman, of Seattle, Wash., for claimant.

CUSHMAN, District Judge. On the evening of March 1, 1914, between 7:30 and 8 o'clock, the sound steamers Camano and Modoc came in collision in the waters of Elliott Bay, Seattle's harbor, in the vicinity of Pier Nine.

The Modoc is a freight carrier 165 feet long, of 195 tons. The Camano is a passenger and freight carrier 110 feet long, of 98 tons. There is a libel brought by the Camano and a cross-libel by the Modoc, to recover for the damages sustained.

The night was clear. The Camano had, a few minutes before, left her berth at pier 3, backing out into the stream, about 600 feet, turning to starboard, and had proceeded northward to make a landing in the slip on the south side of pier 9. She was headed in for pier 9 at the time of the collision. There is a dispute in the testimony as to whether she was headed directly in, or finding her way in on a more northerly course. There is also a dispute as to how far out from a line along the face of the piers the collision occurred.

The Modoc was coming in from Everett to make a landing on the face of pier 3, her usual course in making such landing being, after passing Four-Mile Rock, to draw in near pier 6 and proceed south along the line of piers to her berth.

On behalf of the Modoc, it is contended that the collision occurred off pier 6. The Camano had slackened speed to about four miles an hour to make her landing. The Modoc was making eight miles per hour.

On account of the fact that those on the Camano were intent upon the landing they were making, it is more likely that they are right in the location of the point of the collision than those on the Modoc, who were only engaged in getting off pier 6 before proceeding to pier 3. I therefore find the point of collision no further south than off the face of pier 8, nor out further from the face of the pier than 400 feet. The stem of the Modoc struck the Camano almost at right angles on her port bow, 10 or 15 feet back of her stem.

The inland rules for preventing collisions provide:

"Art. 19. When two steam vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other. * * *"

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by the rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other." 2 Fed. Stat. Ann. 162.

The pilot rules for inland waters provide:

"Rule 8. When two steamers are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steamer is overtaking another, the steamer which has the other on her own port side shall hold her course and speed, and the steamer which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed or stop or reverse. The steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered by the other steamer by one short blast of her whistle as a signal of her intention to direct her course to starboard so as to cross the stern of the other steamer or otherwise keep clear.

"If from any cause whatever the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steamers shall be stopped, and backed, if necessary, until signals for passing with safety are made and understood.

"Rule 9. When two steamers are approaching each other at right angles or obliquely, other than when one steamer is overtaking another, so that the steamer having the other on her own starboard side may cross the bow of the other without involving risk of collision, the steamer having the other on her own starboard side may cross the bow of the other. If the steamers are within half a mile of each other, the steamer having the other on her own starboard side shall give, as a signal of her intention to cross the bow of the other, two short and distinct blasts of her whistle, which, if assented to, the other steamer shall promptly answer by two similar blasts of her whistle, when the steamer having the other on her own starboard bow may cross the bow of the other, in which case the steamer having the other on her own port side shall keep out of the way of the other. If, however, the steamer having the other on her own port side deems it dangerous for the other steamer to cross her bow, she shall sound the danger signal, in which case both steamers shall be stopped, and backed if necessary, until signals for passing with safety are made, answered and understood."

Under these rules, the Modoc was the burdened vessel. It was her duty to keep out of the way of the Camano and to pass under her stern. The Modoc contends that she gave two whistles, indicating that she would cross the bow of the Camano, thus leaving her on the starboard side of the Modoc. Rule 9 authorizes such a maneuver only when it can be executed without involving risk of collision. The Modoc, by this maneuver, took the risk of collision.

Those on the Camano testified that they heard but one whistle from the Modoc, indicating that she would pass to the stern of the Camano. There is no dispute that the Camano answered with one whistle, indicating that she would keep her course.

On behalf of the Modoc it is claimed that, when 200 yards away, she first sighted the Camano, which she had not before seen because of smoke from the latter; that, when she sighted her, she could not see her lights or determine which way she was going; that the Modoc

immediately stopped and reversed her engines; that she only gave the two whistles when collision was imminent; that the circumstances authorized a departure from the rules in an attempt to escape collision; that, if it was a mistake, it was one made in extremis.

The harbor regulations of the city of Seattle provide:

"Sec. 32. That it shall be unlawful to run any vessel * * * within the corporate limits of the city of Seattle at a greater rate of speed than six (6) miles per hour, within certain limits as herein prescribed, to wit, within two thousand (2,000) feet of such dock or wharf at which such vessel or other water craft intends to make a landing. Provided such vessel * * * is approaching from or near the bell buoy off Duwamish Head, and if such vessel or other craft is approaching from or near the direction of Four-Mile Rock and running parallel or nearly parallel to said docks or wharves, it shall be unlawful to run at a greater rate of speed than six (6) miles an hour inside of a line run one mile parallel to said docks and wharves."

The Modoc was clearly in fault in keeping a speed of eight miles per hour on a course almost parallel to the face of the piers in a harbor of this character, no further out from the piers than she is shown to have been. Vessels finding their way into the slips or coming out necessarily have small headway, or sternway, and so can do little, so far as handling the vessel is concerned, to escape collision.

There being smoke drifting northerly, or northwesterly from the Camano, sufficient to prevent those on the Modoc seeing either the signal or cabin lights of the Camano, I am unable to find that there was fault on the part of the lookout on the Camano for not sooner sighting the Modoc.

On behalf of the Modoc, it is contended that the mast head light of the Camano was not burning prior to the collision. The mast head light, the side and range lights, were lit on the Camano before leaving pier 3. After the collision, the master of the Modoc, as the vessels backed away, called to the Camano that her headlight was out. This light was an electric one; the wires being carried in pipes to a point above the hurricane deck, where a detachable connection was made by means of a block thrust into a socket, some distance above the deck. After the collision, the block was found out of the socket, on the deck, and was replaced before the landing was made at pier 9. It was shown that, upon former occasions, the block had been knocked out of the socket by shocks of articles coming in contact with the conduit pipe in which the wires were carried to the socket. It is not unreasonable to suppose that the block was jarred out of the socket by this collision. The testimony on the part of the Modoc that the light was not burning prior to the collision is discredited by the fact that those so testifying did not see the range light of the Camano, which was admittedly burning. The smoke of the Camano could not drift forward so as to obscure the side lights, and aft, so as to obscure the range light and not reasonably be expected to obscure the mast head light, being higher than the side lights and not so high as the range light.

I am unable to find any fault on the part of the Camano contributing to the collision. The parties have agreed to the amount of damages, and decree will be for libelant for such amount.